**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

VICTORIA MATTHEWS, Administrator
of the Estate of Cody Bohanan,

      Plaintiff,

    v.

BUTLER COUNTY, et al.,

      Defendants.

Case No. 1:22-cv-380

Barrett, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Victoria Matthews filed suit against Butler County and eighteen individual Defendants following her 24-year-old son's untimely death in the Butler County Jail. Defendants' motion for summary judgment has been referred to the undersigned for initial consideration. In this Report and Recommendation ("R&R"), the undersigned recommends that Defendants' motion be GRANTED in part and DENIED in part.

**I.    Background**

Convicted on a second-degree misdemeanor drug-related offense, Cody Bohanan ("Bohanan") was sentenced to 60 days incarceration and entered the Butler County Jail ("Jail") the same day. (Doc. 36-2). He died four and a half days later. Following his death, Plaintiff was appointed Administrator of his Estate. Plaintiff filed suit against Butler County as the governmental unit "responsible for the policies, practices, and customs" of the Jail. (Doc. 24, ¶ 7). Plaintiff also named ten correctional officers and seven medical staff who worked at the Jail in their individual capacities, as well as Sheriff Richard K. Jones.[1]

---

[1]Sheriff Jones alone is named in both his official and individual capacities.

Bohanan died from complications associated with withdrawal from opiates and alcohol. As in *Grote v. Kenton Cnty, Kentucky*, 85 F.4th 397, 400 (6th Cir. 2023), this case "exposes myriad failures by county and jail officials" in their response to the dangers of opioid withdrawal. While Bohanan did not exhibit any symptoms when first booked into the Jail, he began to vomit profusely early the next morning. Medical personnel did not conduct any examination of Bohanan until the third day of his incarceration, by which time he had been exhibiting withdrawal symptoms for more than 24 hours. Yet staff offered no treatment and failed to monitor him beyond once-a-day "vitals" checks.

But in part because Plaintiff must proceed under the difficult-to-meet Eighth Amendment standard for deliberate indifference claims rather than a lower Fourteenth Amendment standard, the undersigned concludes that all ten correctional officers are entitled to summary judgment, as are five of the medical staff and Sheriff Jones in his individual capacity. By contrast, a reasonable jury could find that two paramedics and the Medical Director exhibited deliberate indifference to Bohanan's serious medical needs and acted recklessly under state law. In addition, a reasonable jury could find for Plaintiff and against Defendant Sheriff Jones in his official capacity and Butler County on federal claims that Butler County ultimately was responsible for the unconstitutional customs, policies, and procedures that caused Bohanan's death.

## II.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present sufficient probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. "The mere scintilla of evidence will be insufficient; there must be evidence on which the jury could reasonably find" for the nonmoving party. *Id*. at 252.

### III.    Findings of Fact

Both correctional and medical Jail staff work 12-hour shifts, beginning at either 7 am or 7 pm. Individuals incarcerated at the Jail frequently have histories of opiate and alcohol use, and commonly experience withdrawal symptoms. (Doc. 41, PageID 1947; Doc. 38, PageID 1227-28; Doc. 55, PageID 4193 (testimony that 80% of inmates have a history of fentanyl and heroin use)). Such symptoms may include nausea, vomiting, diarrhea and sweating, all of which create a risk of dehydration and can result in death. (Doc. 56, PageID 4377, 4417; Doc. 37, PageID 1019; Doc. 39, PageID 1523-24).

**July 1, 2021**

Convicted of a misdemeanor drug-related offense, Bohanan was booked into the Jail at approximately 4:40 pm by Corrections Officer (C/O) Matthew Larsh.[2] Larsh went over intake and screening forms, recording Bohanan's responses. Bohanan stated he

---

[2]Unlike other officers who interacted with Bohanan, Larsh is not a defendant.

had used "heroin [and] fentanyl" over the past six months, but denied using heroin or other opiates on a different section of the same form. (Doc. 36-3, PageID 939, 943). In another contradiction, Larsh wrote "No" in response to a query about prescription medications, but filled in the adjacent field with the note: "clendamiacin (antibiotic) for face, anxiety meds." (*Id*., PageID 942). During booking, Plaintiff neither expressed nor exhibited withdrawal complaints. After booking, he was placed in cell E14 for a 10-day quarantine period based on a Covid-19 protocol. The cell  was equipped with a sink and running water, and housed inmate Markeese Brice at the time.

**July 2, 2021**

At 3:25 am on July 2, paramedic Tylar Schnell reviewed Bohanan's intake forms and ordered him to be examined by a paramedic the next day, on July 3, based on his reported prescription for an antibiotic for his face. (Doc. 53, PageID 3994-3996).

Early that same morning, inmate Brice was awakened by "dripping shit" from Bohanan's top bunk onto his arm. (Videotaped Witness Statement, Doc. 63, at 1:48, 2:12, 2:40, 4:10).[3] According to Brice, Bohanan vomited "at least twelve times" and left his "pukey towels" around the cell, which angered Brice. (*Id*., 3:20, 1:48, 2:12, 2:40, 6:26). Bohanan told him he was withdrawing from fentanyl but Brice "cuss[ed]" at him because the cell was so dirty. (*Id*.)

At 7 am, C/O Aaron Green began his shift. (Doc. 37, PageID 957, 1041). Jail policy instructed officers to conduct rounds every 40 minutes during shifts. The timing of rounds varied in practice, but included glancing through cell windows or doors to "make sure that inmates are not fighting, inmates are awake or asleep[,] to make sure that they're doing

---

[3]Shortly after Bohanan's death, a jail detective interviewed Brice and videotaped the interview.

what they're supposed to be doing in their cell" and that nothing is "going on…that's not supposed to be happening," such as "hanging sheets on lights, covering windows, obstructing my view…." (*Id.*, PageID 1077). Green conducted 10 rounds and C/O Lagemann conducted two rounds during the day shift on July 2.

Early in Green's shift, Bohanan used the emergency button to report his withdrawal symptoms and to request a shower and a new uniform due to vomiting. Bohanan walked slowly but unassisted from his first-tier cell to the second-tier showers. (*Id.*, PageID 1041-1043, 1052, 1054). After Bohanan remained in the shower longer than permitted, Green discovered Bohanan lying down on his side under the running water, with his knees to his abdomen. Bohanan had defecated (diarrhea). (Doc. 37, PageID 1042, 1050, 1058). Green thought Bohanan was doing "what most people do with opiate withdrawal, lay under hot water" and that diarrhea "was common in the shower." (*Id.*, PageID 1043, 1073). Green ordered him to wash his excrement down the drain and stand up, but ultimately escorted him to his feet. (*Id.*, PageID 1042-1043). He wrote up an incident report, which reads in relevant part:

> I advised Bohanan several times that he needed to get dressed and get out of the shower. He refused all direct orders and continued to stay in the shower. I then placed Bohanan in an escort position and removed him from the shower floor and dressed him back into his uniform. Bohanan was then escorted back to his cell without further incident.

(Doc. 37-2, PageID 1141). Apart from entering the incident report into a computer system, Green alerted no one of Bohanan's physical condition.

During an internal investigation and at his deposition, Green testified that Bohanan was polite and compliant with directives and "dressed himself" after being removed from the shower. (Doc. 37-4, PageID 1155; Doc. 37, PageID 1059-1060). Bohanan walked

back to his cell without assistance. (*Id.*, PageID 1059-1060). Green was verbally reprimanded for his failure to include those details in his report, as well as the detail that Bohanan climbed unassisted back onto his top bunk. (Doc. 37-4; PageID 1155).

When Green passed out lunch trays around 11 am, Bohanan exited his cell and laid down in front of the tray cart to force Green to summon medical help. (Doc. 37, PageID 1061, 1064-1065). Bohanan remained prone for about 10 minutes. (Doc. 61, PageID 4619; Doc. 63 at 8:23, 8:39). Another inmate in E-pod, Robin Hughes,[4] told Green: "The kid needs help. He's sick. You know he's sick. He needs to see a doctor," but Green "laughed…while he was laying there." (Doc. 61, PageID 4617, 4636-38). Bohanan returned to his cell after Green agreed to call medical. (Doc. 37, PageID 1066).

Green called medical staff shortly thereafter and informed them of Bohanan's withdrawal complaints including vomiting, but did not report his diarrhea. (Doc. 37, PageID 1067). Paramedic Jamie Pearson stated that medical staff were already aware of Bohanan's withdrawal[5] and that he would be examined the next day. She reassured Green "this is part of withdrawal symptoms," and advised him to call back only if symptoms worsened. (*Id.*) Green did not call back, nor did he pass along information about Bohanan to supervisors or other officers. (Doc. 37, PageID 1071, 1097, 1084).

Inmate Hughes testified that other inmates could see vomit on the wall and "puke with…blood[6]….by the toilet" and sink when Bohanan's cell door was open on July 2.[7]

---

[4]Hughes became Bohanan's cellmate the following day on July 3, Contrary to other testimony in the record, Hughes testified that Bohanan laid down by a set of steps at the end of a rec period in which Bohanan had participated. (Doc. 61, PageID 4616-4617, 4619).

[5]The record is silent concerning how medical staff became aware of that fact before Green's call.

[6]Explaining the blood he observed, Hughes testified to his belief that Bohanan's first cellmate (Brice) had assaulted Bohanan, causing bleeding from Bohanan's mouth. (Doc. 61, PageID 4578-79).

[7]Hughes' testimony is often vague and both internally inconsistent and inconsistent with other records. For example, Hughes initially testified that he first saw Bohanan on June 24, 2021, (Doc. 61, PageID 4548), but Bohanan did not enter the Jail until July 1. Hughes testified that he was Bohanan's cellmate for 3 days

(Doc. 61, PageID 4551-4552, 4563). Green admits to walking past Bohanan's open cell door at least a few times but denies any such observations. (Doc. 37, PageID 1078-79). During a "few" rounds, he saw Bohanan sitting on his top bunk watching TV, "standing up at the sink" at the water fountain and "getting water in a drinking cup." (*Id*., PageID 1071, 1081-82). At dinner tray pass, Bohanan retrieved his tray and made no further complaints. (*Id*., PageID 1072).

**July 3, 2021**

Deputy Brenden Kelly worked the 7 am to 7 pm day shift, logging three rounds in which he reported that all inmates were safe and secure. (Doc. 40-2, PageID 1798-99).

At approximately 9:30 am, Paramedic Pearson arrived at Bohanan's cell to conduct an initial medical screening. (Doc. 38, PageID 1325-26, 1347, Doc. 53-2, Exh. 36; *see also* Doc. 38-5, Exh. 33). The screening includes a full physical examination during which medical personnel will ask the inmate a series of questions to determine their health and risk factors. (Doc. 38, PageID 1220-1221). Bohanan told Pearson that he used opiates and alcohol including drinking a fifth of liquor several times a week, and using pain medication that he "got off the street" three days earlier. (Doc. 36, PageID 895, 901; Doc. 38, PageID 1328, 1350-1351).

Pearson documented Bohanan's blood pressure as 90/50, with normal temperature, pulse, and pulse oxygen saturation readings. (Doc. 38, PageID 1348, 38-5, Exh. 33). Although she recorded that Bohanan was withdrawing from opiates and alcohol, she noted "no visible signs" at the time of her exam. (Doc. 38, PageID 1350-1351). She

---

(Doc. 61, PageID 4585) but jail records state that he moved into Bohanan's cell on July 3 and moved out on July 4. (Doc. 61, PageID 4664). But for purposes of the pending motion, the undersigned credits Hughes's testimony about the visible conditions of Bohanan's cell as well as his testimony about other signs of Bohanan's deteriorating physical condition.

7

could not recall if she asked about any symptoms, such as whether he had been vomiting or had diarrhea, whether he could eat or drink, or anything else. She also could not recall if she asked for a pharmacy name for his reported past prescriptions of Clonidine and Promethazine, but she did not continue them. (*Id*., PageID 1349-50). Instead, in accordance with "standard practice" at the Jail at that time for inmates going through withdrawal, she placed Bohanan on a 7-day once-per-day check of blood pressure, pulse, and oxygen saturation. (Doc. 38, 1222-1223; Doc. 41, PageID 1973-74).

Around 5:03 pm, Brice moved out of Bohanan's cell, and Hughes was moved in. (Doc. 61, PageID 4682-84). Hughes testified that Bohanan had "puke on his face sticking all in his hair and uniform shirt," and  that vomit was visible on the floor, wall and toilet including "black blood from top to bottom of the wall." (Doc. 61, PageID 4573, 4639, 4641). C/O Kelly granted Hughes' request for cleaning supplies and Hughes spent 20-30 minutes mopping and cleaning the cell. (Doc. 61, PageID 4573-75). Hughes testified that during the time he remained in Cell E14, Bohanan would get out of bed only to get sick or try to make it to the toilet, and continued to vomit and defecate on himself without eating or drinking. (*Id*., PageID 4640, 4685-86, 4574). According to Hughes, Bohanan did not leave his cell for rec periods and did not retrieve his dinner tray after Kelly refused a request by Hughes to take it to him. (*Id*., PageID 4587, 4612, 4614).

C/O Keifer Moody worked the overnight shift from 7 pm on July 3, 2021 to 7 am on July 4, 2021, reporting that all inmates were safe and secure in at least 12 rounds. (Doc. 40-2, PageID 1799-1800; Doc. 40-3, PageID 1801-02). Hughes testified that he requested a shower and fresh uniform for Bohanan and additional cleaning supplies during Moody's shift in order to clean "the blood that [Bohanan] was puking up." Moody

granted the request for cleaning supplies and for Bohanan to go shower. (Doc. 61, PageID 4581-83). Hughes saw Bohanan "squatting down holding his ankles" in the shower. (*Id.*, PageID 4584).[8] Apart from his shower, Bohanan stayed in his cell "laying in his own puke and shit." (*Id.*, PageID 4615, 4659; Doc. 62, PageID 4747).

**July 4, 2021**

Shortly before the end of his shift, around 5:48 am, Moody granted Hughes's request to take Bohanan's breakfast tray to him. (Doc. 61, PageID 4588-94, Doc. 40-3, PageID 1802).

Defendant Kelly completed five rounds during his next day shift from 7:20 am until 7 pm. (Doc. 40-3, PageID 1803-05; Doc. 40, PageID 1686-87). He observed Pearson return for a "vitals check" at 10:33 am. (Doc. 40-3, PageID 1803; Doc. 38, PageID 1359). She documented Bohanan's improved blood pressure at 120/80 and normal temperature, pulse rate and pulse oxygen saturation. (Doc. 38, PageID 1359-1360).

In addition to rounds, at 11:23 am, Kelly passed out lunch trays and again logged that all inmates were "safe and secure," even though Bohanan was "balled up" on his bed lying in his own vomit and feces at the time. (Doc. 61, PageID 4615, 4640, 4659). Hughes again asked to take Bohanan's tray to him. Kelly agreed, but Bohanan "just let it sit." (Doc. 61, PageID 4590, 4594-95; Doc. 40-3, PageID 1803-04). Hughes moved to another cell after lunch. Before being moved, he asked Kelly for clean sheets and a clean uniform for Bohanan multiple times. Kelly stated he would get to it. (Doc. 61, PageID 4580-82, 4621, 4643-44).

---

[8]Hughes's testimony on when he saw Bohanan "squatting down" in the shower was inconsistent. (See Doc. 61, PageID 4626-4630),

Inmate James Ratliff was moved into Bohanan's cell the same afternoon. During the time that Ratliff shared Bohanan's cell, Bohanan laid in the bottom bunk.[9] He "never moved, never moved from the fetal position at all" and "[k]ept puking and defecating on himself," and "it was clearly obvious that something was wrong." (Doc. 62, PageID 4741-42). Bohanan was vomiting what looked like "black tar" on himself and the cell "smelled terrible" (*Id.*, PageID 4743, 4781-82).

C/O James Guard worked the night shift in E-pod from 7 pm July 4 to 7 am on July 5, during which he conducted 12 rounds. (Doc. 40-3, PageID 1805-07; Doc. 51-2, PageID 3583-84). C/O Benoit conducted one round during the same shift. There is no evidence that either had any interaction with Bohanan.

**July 5, 2021**

C/O Mitchell began his day shift at 7 am. (Doc. 51-2, PageID 3584). At the end of a morning rec period, Ratliff asked Mitchell, "is there anything we can do for this guy?" (Doc. 62, PageID 4749-52). Ratliff specifically reported: "[H]e's not ate, he's not drank any water or anything. He's not moved from the fetal position. And he keeps puking and peeing and crapping all over himself." (Doc. 62, PageID 4750-51). He testified that "the guy clearly needed help" and told Mitchell it "smells pretty bad in there." (*Id.*, PageID 4751). Mitchell told Ratliff that only alcohol withdrawal was fatal and that nothing could be done since "unfortunately, he's not withdrawing from alcohol." (Doc. 62, PageID 4750-51, 4788).

About an hour later at 11:23 am, Paramedic Megan Biegel arrived to check Bohanan's vital signs. (Doc. 52, PageID 3839-40, 3846; Doc. 38-5, PageID 1342). Ratliff

---

[9]It is unclear from the record when Bohanan moved from the top bunk to the bottom bunk.

described Bohanan's breathing during her visit as a "death rattle." (Doc. 62, PageID 4754). Bohanan appeared lethargic and Mitchell saw "a little bit of black phlegm on the front of his uniform shirt." (Doc. 51, PageID 3532-33). Biegel recorded Bohanan's blood pressure as 100/60, his temperature as 97, his pulse at 130 beats per minute and his pulse ox at 97% (Doc. 38-5, PageID 1433). She charted that Bohanan "was seen at cell door due to complaint of weakness and unable to stand. Patient states that he is vomiting, having diarrhea" and appeared "diaphoretic" or extremely sweaty. (Doc. 52, PageID 3848; *see also id*., PageID 3849, "Patient was unable to stay standing during assessment and was assessed while sitting on cell floor."). Biegel testified that he walked to the cell door to be evaluated before sitting. (Doc. 52, PageID 3800, 3845). She asked him about his food and liquid intake but he did not answer, even when she repeated her question. (Doc. 52, PageID 3849-3850). She did not chart his failure to answer, or the vomit she observed.

Between 3 pm and 4:47 pm, Bohanan's cell door was opened for recreation but he remained in bed. Mitchell rounded twice during that time. He reported all inmates were safe and secure on all 16 rounds he completed. (Doc 51-2, PageID 3584-87).

C/O Wood reported for night shift at 7 pm. Prior to 10 pm, Wood denied seeing anything that would have led him to believe that Bohanan was in distress. (Doc. 39, PageID 1577). At 10 pm, Wood observed Mr. Bohanan seated on the floor "in a normal position." (Doc. 39, PageID 1564). Twenty minutes later, he saw Bohanan "laying on his side" in an "uncomfortable" position, and noticed " a greenish substance that ...I knew to be bile on the front of his shirt." (Doc. 39, PageID 1565). Wood "immediately" entered the cell, checked for a pulse and began chest compressions in an unsuccessful resuscitation attempt (*Id.*) Bohanan was declared dead at 11:50 pm. An autopsy report lists the cause

of death as dehydration resulting from withdrawal; laboratory results were positive for the presence of opioids (fentanyl and norfentanyl). (Doc. 43-4, PageID 2544, 2549).

After Bohanan's death, another inmate (James Trammel) filed a request for a formal grievance in which he complained that the C/O on night shift (Wood) "made a comment" because Bohanan was "obviously" ill. (Doc. 66-1, PageID 4932, Doc. 51-2, PageID 3588). Trammel reported that Bohanan's cellmate (Ratliff) told Wood how ill Bohanan was and that he was "barely moving" and "only getting up to vomit black." (Doc. 66-1). Wood asked "another officer on charge what to do with" Bohanan but that officer only laughed and said, "we will see what happens." (*Id.*)

**Events after Bohanan's Death**

Shortly after midnight in the early hours of July 6, 2021, Detective Joseph Nerlinger arrived at the Jail to investigate the death, in accordance with Jail policy to treat all deaths as homicide investigations until determined otherwise. Detective Nerlinger contacted Detective Ricky Phillips, a new detective, to accompany him. The detectives interviewed Bohanan's cellmates, including Brice, Hughes, and Ratliff, (*see* Doc. 43, PageID 2422), and reviewed Bohanan's jail records and the autopsy report before concluding that Bohanan died of natural causes. (*Id.*, PageID 2416-17, 2501).

 In the course of this litigation, Bohanan's family confirmed they were generally aware of his drug addiction and withdrawal issues. (Doc. 46, PageID 2893-95; Doc. 45, PageID 2795; Doc. 44, PageID 2671-73). Bohanan also had been diagnosed at 16 with cyclic vomiting syndrome, which causes severe dehydration and electrolyte imbalance and had been hospitalized approximately ten times to receive IV fluids for that condition. (Doc. 46, PageID 2898-2899). In fact, family members testified that Bohanan had

withdrawn from opiates while staying at the family home, and sometimes required IV fluids at a hospital for his symptoms. (Doc. 46, PageID 2923-2926, Doc. 44, PageID 2671-73). None of that medical history was shared with Jail staff by Bohanan's family or by Bohanan himself.

Plaintiff alleges that two months after Bohanan's death, another inmate, Diann Pink, also died from complications from drug withdrawal while in custody at the Butler County Jail. (Doc 24, ¶¶102-106).

In August 2022 and again in March 2023, the County made significant changes to its protocols and policies regarding withdrawal, including instituting a system to communicate to "oncoming shift officers… that someone in the pod was going through withdrawal." The new protocols require different color uniforms for detoxing inmates, require officers to contact medical upon observation of certain symptoms, and place withdrawing inmates in areas where they can be monitored every ten minutes. (Doc. 42, PageID 2300-2304, *see also* Doc. 69-1, Page ID 5086-93 (revised withdrawal training relating to alcohol and benzodiazepine).

### IV. Plaintiff's Deliberate Indifference Claims Against Individuals

Plaintiff alleges that eighteen individuals and Butler County violated Bohanan's civil rights under 42 U.S.C. § 1983 by exhibiting deliberate indifference to Bohanan's serious medical needs. Bohanan was not a pretrial detainee but was an inmate serving his 60-day sentence. The Eighth Amendment prohibits "'unnecessarily and wantonly inflicting pain' on an inmate." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Such a claim requires a plaintiff to establish both an objective and a subjective component: (1) a sufficiently grave

deprivation of a basic human need; and (2) a sufficiently culpable state of mind on behalf of the person acting under color of state law. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Defendants argue that they are entitled to summary judgment because Plaintiff cannot prove either the objective or the subjective component of Bohanan's claims against them.

All individual Defendants also claim qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)). "To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation." *Downard v. Martin*, 968 F.3d 594, 599-600 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)). Here, Plaintiff must show that *each* Defendant subjectively perceived that their failure to seek medical attention for Bohanan created a significant risk to Bohanan's health, and that they "'consciously' (not recklessly) disregarded that risk." *See Lawler v. Hardeman County, Tenn.*, 93 F.4th 919, 928 (6th Cir. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 837, 839 (1970)).

## A. The Objective Component: Bohanan's Serious Medical Need

The objective component of Plaintiff's claim requires proof of a sufficiently serious medical need, meaning a condition "that has been diagnosed by a physician as mandating treatment *or one that is so obvious that even a lay person would easily*

*recognize the necessity for a doctor's attention*." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted, emphasis added). Defendants argue first that summary judgment should be granted because Plaintiff cannot show that Bohanan had an objectively serious and "obvious" medical need. Although a paramedic confirmed that Bohanan was suffering from alcohol and opioid withdrawal on July 3, no physician ever diagnosed Plaintiff's withdrawal symptoms prior to his death.[10] Without a formal diagnosis, deliberate indifference cases rely on the "obviousness" of symptoms.

Here, however, controlling Sixth Circuit case law confirms that Plaintiff has presented sufficient evidence of objectively "obvious" symptoms to overcome Defendants' motion. It is true that Bohanan did not show any withdrawal symptoms when he was first booked into the Jail, despite admitting his recent use of heroin and fentanyl. But by all accounts, Bohanan very quickly exhibited obvious withdrawal symptoms beginning with vomiting and diarrhea on July 2 that persisted until his death on July 5. Bohanan reported his withdrawal symptoms to jail staff and other inmates, and sought medical assistance from Green on July 2. Cellmates testified to visible vomit and/or excrement inside Bohanan's cell, as well as to the strong odor of the same. And a paramedic's July 3 examination record confirms medical staff's understanding that Bohanan was suffering from withdrawal.

The Sixth Circuit has held "[o]n numerous occasions… that drug or alcohol-related symptoms, like those associated with withdrawal or overdose, are sufficiently serious and obvious to laymen." *Grote*, 85 F.4th at 406 (citations omitted). In general, a death that results from external symptoms that would have been apparent to a layperson during the

---

[10]Paramedic Pearson admitted that her limited scope of practice under Ohio law does not include the diagnosis of medical conditions.

relevant time period constitutes a "sufficiently serious [need] to meet the objective component." *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 463 (6th Cir. 2021) (quoting *Blackmore*, 390 F.3d at 900); *accord Sturgill v. Muterspaw*, No. 1:19-cv-594-JPH-SKB, 2024 WL 3925663, at **8-10 and n.19 (S.D. Ohio Aug. 22, 2024) (holding that detainee who exhibited evolving symptoms during defendants' time at jail had "obvious" medical need, and that consideration of what the defendants knew improperly conflated the objective component analysis with the subjective component), R&R adopted at 2025 WL 942434 (S.D. Ohio March 28, 2025); *see also Blackmore*, 390 F.3d. at 899 (reasoning that vomiting is "a clear manifestation of internal physical disorder" for which some level of medical attention is warranted).

In a recent Sixth Circuit case, *Hodges v. Abram*, ___F.4th ___, 2025 WL 1522523 (6th Cir. May 29, 2025), the Sixth Circuit cautions against reading *Burwell* too broadly, as if the objective component is *automatically* met when symptoms result in a death. There, the plaintiff could not show the objective component because the decedent exhibited no obvious symptoms of his fatal ingestion of a plastic bag containing cocaine until 22 hours *after* the defendant arresting officers had last interacted with him. When questioned by the arresting officers, the arrestee had repeatedly denied swallowing any cocaine. And while being booked at the jail, he was examined (twice) by the jail nurse who found no evidence of drug use, and a full-body X-ray ruled out any foreign objects. Based on that record, the appellate court confirmed – consistent with prior case law – that evaluation of the objective component may reference the timing of *when* symptoms became "obvious" to any layperson vis-à-vis the timing of defendants' involvement. *See also Reed v. Speck*, 508 Fed. Appx. 415 (6th Cir. 2012) (affirming summary judgment where decedent refused

to provide medical history and exhibited no obvious symptoms at the time of his interaction with medical staff, until just before his death from a cardiac condition). Unlike the facts presented in *Hodges* and *Reed*, the intestinal symptoms that led to Bohanan's death began on July 2 at a time that overlapped with various Defendants' contact with him. For that reason, *Burwell* applies.

### B. The Subjective Component: an Individualized Inquiry

Having determined that Plaintiff has presented sufficient evidence on the objective element, the undersigned turns next to the subjective element. The subjective inquiry is individualized, meaning that Plaintiff must point to evidence that each Defendant personally exhibited deliberate indifference based on what they saw, knew, and did when they interacted with Plaintiff. In *Burwell*, the Sixth Circuit reiterated what a Plaintiff must show to satisfy the subjective component under the Eighth Amendment standard:

> "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). This "standard is not whether there is something easy that the [defendants], with the benefit of hindsight, could have done." *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc). Instead, "[w]e must judge their actions based on the information that was available to them at the time." *Rouster*, 749 F.3d at 453. We must address the subjective component for each officer individually, *Garretson*, 407 F.3d at 797, and "information available to one defendant may not be automatically imputed to the others," *Rouster*, 749 F.3d at 447 (citing *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).
>
> While "[t]he plaintiff bears the burden of proving subjective knowledge, ... courts may "infer from circumstantial evidence that a prison official had the requisite knowledge," *Comstock*, 273 F.3d at 703. An "official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8). And "a factfinder may conclude that a prison official knew of a substantial risk from the very fact

17

that the risk was obvious." *Rouster*, 749 F.3d at 447 (quoting *Farmer*, 511 U.S. at 842).

*Burwell*, 7 F.4th at 466-467.

In addition to *Burwell*, the Sixth Circuit's analysis in other jail cases like *Helphenstine v. Lewis Cty*, 60 F.4th 305 (6th Cir. 2023) and *Grote* is instructive, with the caveat that critical distinctions apply to the analysis of the subjective component under the Fourteenth Amendment.[11] For example, in *Helphenstine*, multiple jail staff members admitted to personal knowledge that the decedent was experiencing severe symptoms of withdrawal including vomiting with diarrhea, and required both close observation and medical attention. Based on an individualized assessment, the Sixth Circuit reversed the district court's grant of summary judgment to jailers who admitted to knowledge of such severe symptoms that a reasonable jury could find they were deliberately indifferent to the decedent's need for urgent medical help. *Id*., 60 F.4th at 318-320. Notably, the court affirmed summary judgment for the nonmedical defendants who did not personally observe "vomiting, diarrhea, shaking, sweating, or any other manifestation of illness," and therefore had no "'reason to appreciate the seriousness of [Helphenstine's] condition.'" *Helphenstine*, 60 F.4th at 321 (quoting *Speers v. City of Berrien*, 196 Fed. Appx. 390, 396 (6th Cir. 2006)).

---

[11]To prove the subjective component under the Fourteenth Amendment, "a pretrial detainee need only prove 'something akin to reckless disregard.'" *Grote*, 85 F.4th at 405 (quoting *Brawner v, Scott County*, 14 F.4th 585, 596 (6th Cir. 2021)) (additional citation omitted). In other words, *Brawner* lowered the subjective component "from actual knowledge to recklessness" for Fourteenth Amendment claims. *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 316 (6th Cir. 2023); *Grote*, 85 F.4th at 405 ("[T]he level of culpability with which a defendant must act to establish deliberate indifference to pretrial detainees is lower than that necessary for convicted incarcerated individuals."). Therefore, a defendant who acts - or fails to act - recklessly in the face of a serious medical need of a prisoner may win summary judgment under the Eighth Amendment standard, even though summary judgment would be denied for the same conduct under the Fourteenth Amendment. *See Grote*, 85 F.4th at 409 (rejecting defense that defendant subjectively perceived only "routine withdrawal" symptoms that required no further treatment "in light of our post-*Brawner* jurisprudence.").

Like the subjectively unaware defendants in *Helphenstine*, most individual Defendants, including all ten correctional officers and most supervisory medical staff, had little to no interaction with Bohanan on their respective shifts and no reason to appreciate the seriousness of his condition. For that reason, summary judgment should be granted to those Defendants. By contrast, Plaintiff's claims against two paramedics, Dr. Abdullah, and Butler County itself are sufficient to go to a jury.

**1. Ten Correctional Officers Lacked the Requisite Subjective Intent**

Plaintiff has sued officers who worked shifts between July 1 and July 5. Jail policy required correctional officers to conduct periodic rounds every forty minutes  in order to "look… at the condition of the prisoners, the condition of the facility, any maintenance issues, any issues with the security of the facility, any issues with the inmates, [and] any signs of contraband or nefarious activity." (Doc. 42, PageID 2232). Officers would check on the health and well-being of inmates "to the extent possible" when walking by and briefly peering in cells, but no personal interaction was required. (Doc. 42, PageID 2233-34). Shift logs reflect varying numbers of rounds by different officers. But the shift logs consistently record that all inmates were "safe and secure" with no reference to Bohanan or his withdrawal symptoms. (*See*, *e.g.*, Doc. 39-2, Doc. 40-2; Doc. 40-3; Doc. 51-2).

 Plaintiff cites to the shift logs as evidence of Defendants' deliberate indifference. (Amended Complaint, Doc. 24, ¶ 33). That said, Plaintiff offers little evidence to show what each individual officer subjectively perceived about Bohanan, actually inferred about him, or did or failed to do after gaining such knowledge. In place of an individualized inquiry, Plaintiff seeks to impute the knowledge of any inmate or staff member who observed any sign of Bohanan's illness at any time to all Defendants. *See Grote*, 85 F.4th

at 413 (plaintiff's "shotgun approach" to accusing the county defendants of failing to do more in observations directed by medical staff did little to show their individual deliberate indifference). But most Defendants had little or no interaction with Bohanan. And as explained below, no evidence suggests that any correctional officer appreciated the severity of Bohanan's withdrawal symptoms and consciously or deliberately disregarded the risk to Bohanan's health and safety. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot… be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838; *accord Helphenstine*, 60 F.4th at 321 (holding that knowledge of withdrawal symptoms alone did not require officers to seek medical care, since withdrawal "typically may be managed in a prison setting and indeed frequently is managed there," (quoting *Speers v. City of Berrien*, 196 Fed. Appx. at 395). All ten officers thus are entitled to qualified immunity.

### a. Correctional Officer Billy McGuire

Start with C/O Billy McGuire. Plaintiff does not reference McGuire at all in opposition to summary judgment. The undersigned's independent review of the shift records suggests that McGuire worked a single shift on July 1 that only briefly overlapped with Bohanan's stay in E-pod.[12] Given the completion of McGuire's shift before Bohanan exhibited symptoms, Plaintiff cannot show either the objective element under *Hodges*, or that he "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703.

---

[12]McGuire worked a day shift on July 1 that ended at 7 pm. Bohanan was not booked into the Jail until 4:40 pm, and was not placed in Cell E14 until 6:17 pm. (Doc. 39, PageID 1556).

### b. Correctional Officer Aaron Green

C/O Aaron Green learned directly from Bohanan that he was ill when Bohanan reported vomiting from withdrawal and requested a shower and new uniform early in Green's shift. Green saw Bohanan moving slowly and lying in his own excrement in the shower. But Green also testified to his belief that "most people" going through opioid withdrawal experienced similar symptoms, and observed that Bohanan walked to and from his first-tier cell to the second-tier showers. However, after Bohanan was discovered lying down in the shower, he placed Bohanan in an escort position, removed him from the shower and dressed him back into his uniform.  Bohanan was then escorted back to his cell without further incident where he climbed back onto his upper level bunk bed.

Plaintiff argues that Green's delay in alerting medical staff - from the time of Bohanan's first request for a shower and uniform change until after tray pass around 11 am - is evidence of deliberate indifference. But aside from the fact that Plaintiff does not point to any evidence that the delay of roughly 3 hours caused harm, there is no evidence that Bohanan requested any medical assistance (as opposed to merely a clean uniform and a shower) until the 11 am tray pass.[13] Green's action in contacting medical staff shortly after Bohanan requested that he do so precludes a finding that Green was subjectively deliberately indifferent to Bohanan's needs.[14]

When Green spoke to medical staff about Bohanan's report of vomiting from withdrawal,[15] Paramedic Pearson informed him that they were aware of the situation and

---

[13]The record reflects that inmates could verbally request medical attention or submit a written request via a kiosk to which they had access when cell doors were open.

[14]Plaintiff points to testimony by Inmate Hughes that Green "laughed at" Bohanan when he laid down in front of the tray cart. But whether Green exhibited kindness or cruelty is irrelevant in light of evidence that he contacted medical staff immediately after tray pass.

[15]Green did not tell Pearson of Bohanan's earlier diarrhea in the shower. But Green testified to his belief that was a "one-time thing." (Doc. 37, PageID 1070). And evidence of Bohanan's ability to walk and

reassured him that Bohanan's symptoms were to be expected. After contacting Pearson, Green was entitled to rely on her reassurance. *See McGaw v. Sevier County*, 715 Fed. Appx. 495, 498 (6th Cir. 2017); *Britt v. Hamilton County*, 533 F. Supp. 3d 1309 (S.D. Ohio 2021) (granting summary judgment to supervising officer who subjectively believed that plaintiff was going through withdrawal which was being monitored and treated by nursing staff).

Plaintiff also complains that Green exhibited deliberate indifference when he failed to tell other officers or supervisors of Bohanan's condition, and did not relay Pearson's advice to notify medical staff if Bohanan's symptoms worsened. But no Jail policy required him to notify other officers or supervisors of Bohanan's symptoms. And Green did not actually observe any worsening symptoms. To the contrary, he testified to seeing Bohanan standing up in his cell at the sink getting a cup of water, watching TV, and grabbing his dinner tray. (Doc. 37, PageID 1071-1072). After 11 am, Bohanan did not again seek assistance during Green's shift.

Green is entitled to qualified immunity because Plaintiff cannot prove anything more than that he was generally aware of Bohanan's illness. In other words, Plaintiff cannot show that Green inferred that Bohanan's withdrawal symptoms posed any significant risk to Bohanan's health (despite Pearson's reassurance), or that he "consciously" disregarded any risk to Bohanan on July 2, 2021. Green had no medical training and denies observing worsening symptoms. Under *Farmer*, the record is

---

communicate refutes any suggestion that Plaintiff required urgent medical attention at that moment, such that the omission amounted to deliberate indifference. *See generally*, *Spears v. Ruth*, 589 F.3d 249, 255-256 (6th Cir. 2009) (holding that officer's omission of relevant information conveyed to EMTs "was at worst negligent and does not rise to the level of a constitutional violation.")

insufficient to show that he *consciously* appreciated the risk to Bohanan's health when he failed to contact medical staff a second time to insist that Bohanan be more urgently seen.

### c. Correctional Officers Joshua Lagemann and Tara Ghalley

Joshua Lagemann worked the same day shift as Green on July 2. But unlike Green, Lagemann conducted only 2 or 3 rounds that morning,[16] in which he reported: "[a]ll appears safe and secure at this time." (Doc. 37-3, PageID 1145). C/O Tara Ghalley worked the overnight shift after Green and Lagemann, from 7 pm on July 2 until 7 am on July 3. She appears to have conducted 19 rounds and a headcount during times when most inmates would have been asleep.[17] (*Id*., PageID 1148-61; Doc. 40-2, PageID 1793-97). It is undisputed that neither Lagemann nor Galley had any interactions with Bohanan or with anyone else about his condition

Plaintiff points to testimony by Bohanan's first cellmate that Bohanan had vomited and left dirty "pukey towels" on the floor on the morning of July 2. (Doc. 63, at 6:26). Additionally, inmate Robin Hughes testified that even before he moved into Bohanan's cell on the afternoon of July 3, he saw vomit on Bohanan's mat and the toilet and cell walls and could smell a strong odor of feces and vomit when he passed by the open door. (Doc. 61, PageID 4551-4552, 4634, 4672-73, 4683). Plaintiff speculates that Lagemann "would have smelled Bohanan's feces and vomit" because he logged a recreation period during which time Bohanan's cell door would have remained open. (Doc. 70, PageID 5121). Similarly, Plaintiff hypothesizes that Ghalley would have conducted at least two rounds during her overnight shift when Bohanan's cell door was ajar, allowing her greater

---

[16]Only two entries directly reference rounds made by Lagemann. It is unclear whether two additional entries included rounds.

[17]Like other correctional staff, Ghalley's entries give no indication that she observed any signs of Bohanan's illness.

visibility of vomit or excrement. But even if Lagemann or Ghalley had observed the dirty towels or detected some odor when passing by (and there is no evidence that they did), they still would be entitled to summary judgment absent any evidence that they drew the inference that Bohanan required urgent medical attention, or that they consciously disregarded any risk to his safety.

### d. Correctional Officer Brenden Kelly

Deputy Brenden Kelly worked the 7 am to 7 pm shift on July 3, during which he logged 4 rounds. At 9:30 am during Kelly's shift, he observed Pearson arrive to conduct a medical screening. According to Inmate Hughes, vomit and feces in the cell were visible at the time of Pearson's exam but Pearson denied seeing any such evidence. Based on Pearson's exam and Bohanan's statements that he was suffering from withdrawal, Kelly was aware that Bohanan was ill and that Pearson had placed him on a 7-day once-per-day vital signs check.

Kelly offered lunch and dinner meal trays to "all inmates" at 11:35 am and again at 5:03 pm. (Doc. 40-2, PageID 1799). Prior to the dinner tray pass, Brice was moved out of Bohanan's cell and Hughes was moved in. At the time Hughes was told he was being moved to Bohanan's cell, Hughes testified that he saw "puke all over the floor, wall, [and] toilet" as well as "puke on [Bohanan's] face sticking all in his hair and uniform shirt." (Doc. 61, PageID 4638, 4641). Hughes requested permission from Kelly to clean the cell, and Kelly provided cleaning supplies. (*Id*., PageID 4573-74).

Plaintiff argues that Kelly would have seen Bohanan "balled up" on his bunk as well as evidence of vomit. And Hughes testified that Bohanan did not leave his cell for

24

recreation that day[18] which Kelly likely noticed. (*Id*., PageID 4612, 4614). As further evidence of Kelly's state of mind, Plaintiff points to testimony that Kelly refused Hughes's request to take Bohanan's dinner tray to him, stating he did not care if Bohanan was sick.[19] (*Id*., PageID 4588). Plaintiff argues that Brice's statements and Hughes's testimony give rise to a reasonable inference that Kelly knew that Bohanan's illness was severe enough for him to forgo both recreation and dinner.

The undersigned agrees that a reasonable jury would find that Kelly was aware of Bohanan's illness on July 3. But the evidence does not show that Kelly was subjectively aware that Bohanan's illness was worsening. When Pearson examined him that morning, she did not express any concern or ask Kelly to monitor Bohanan. Kelly was entitled to rely on her assessment that Bohanan required no more than a daily vitals check. *See Spears v. Ruth*, 589 F.3d at 255 (holding that officer was entitled to qualified immunity where he was less able than EMT to determine inmate's medical needs).

Kelly also worked a consecutive day shift on July 4 in which he conducted six more rounds and reported that all was "safe and secure." (Doc 40-3, PageID 1803-1804). At 10:33 am on July 4, Kelly accompanied Pearson to Bohanan's cell and watched as she performed another check of his vital signs. Again, Pearson expressed no concerns.

At lunch tray pass around 11:23 am that day, "all inmates" were offered a tray. (*Id*., PageID 1804). Hughes again requested permission to take Bohanan's tray to him. This time, Kelly agreed. But Hughes testified that Bohanan was too sick to eat or drink, and remained in his bed. (Doc. 61, PageID 4594-95). Hughes was moved to another cell after

---

[18]Ratliff testified that inmates were provided only one rec period due to Covid protocols, (Doc. 62, PageID 4745-46), but Hughes testified to two such periods (Doc. 61, PageID 4162).
[19]Kelly's shift logs do not note any tray refusals or any other observations about Bohanan.

lunch. Before being moved, Hughes repeatedly asked the C/O (presumably Kelly) to provide Bohanan with additional clean sheets and another uniform exchange due to Bohanan having vomited and defecated on himself. (Doc. 61, PageID 4580-82, 4593-4595, 4621, 4643-44, 4659). The C/O said he would get to it. (*Id.*, PageID 4644).

After lunch, Hughes moved out and Inmate James Ratliff moved in. At the time, Bohanan was lying on his bunk in the "fetal position" and smelled of feces, urine and vomit. (Doc 62, PageID 4743). Bohanan did not leave the cell for recreation. Ratliff testified that he retrieved Bohanan's dinner and asked him "do you want this, bud?" Bohanan responded by reaching out to take it but "just curled it back underneath of him…in the fetal position." (*Id.*, PageID 4741-4743). Plaintiff argues that by July 4, Kelly "must have" observed Bohanan remaining in bed and failing to eat, and would have smelled and seen Bohanan's condition when cell doors were open during the rec period or when Hughes moved out and Ratliff moved in.

The question of Kelly's liability hinges on his subjective understanding of the severity of Bohanan's illness on July 4 and the reasonableness of his continued reliance on Pearson's assessment. Although he knew that Bohanan was suffering from withdrawal, Kelly also understood that Pearson had examined him July 3, and had performed a daily "vitals check" on July 3 and July 4 without expressing any concerns. Kelly never actually spoke to Bohanan and no one (including Hughes, Ratliff, or Bohanan himself) requested any additional medical care for him.

A jury might find that Kelly was aware that Bohanan's condition was worsening, given evidence of additional vomiting (the request for clean sheets and a new uniform by Hughes), the allegedly increased odor emanating from Bohanan, his continued prone

position all day, and evidence that he did not arise on July 4 for meals or recreation. But as for whether Kelly inferred that Bohanan's condition was no longer being adequately addressed by Pearson and consciously disregarded the serious risk to Bohanan's health and safety, the undersigned concludes that Kelly remains entitled to qualified immunity. Kelly did not personally interact with Bohanan, and no one requested additional medical help beyond what Pearson was providing. It was not clearly established that Kelly's continued reliance on Pearson's assessment, in light of Bohanan's arguably worsening symptoms on July 4, violated the Eighth Amendment.

If Plaintiff were proceeding under the Fourteenth Amendment, the result might be different. In *Greene v. Crawford County*, 22 F.4th 593 (6th Cir. 2022), a detoxing inmate exhibited more severe symptoms than Bohanan, including hallucinations and a lack of sleep over more than 24 hours. The jailers placed him under close observation and called for a mental health assessment. The Sixth Circuit denied qualified immunity after rejecting the defendants' contention that they were entitled to continue to rely on the mental health provider's assessment rather than a qualified medical provider, long after it became obvious that the detainee's symptoms required urgent medical attention. The appellate court reasoned that "[a]t a certain point, bare minimum observation ceases to be constitutionally adequate." *Id.* at 609; *see also, generally Helphenstine*, 60 F.4th at 318-320 (denying qualified immunity to jailers who observed inmate in a near-lifeless state after days of illness but failed to seek any medical assistance for him at all, under lower Fourteenth Amendment standard established in *Brawner*). In contrast to *Greene*, Kelly was not relying on a mental health therapist but upon trained medical staff. In addition, *Greene* and *Helphenstine* were both decided after the events in this case, and were based

27

on the lower "recklessness" subjective standard that applies to Fourteenth Amendment claims.

### e. Correctional Officer Keifer Moody

Following completion of Kelly's first day shift on July 3, C/O Keifer Moody worked the overnight shift from 7 pm on July 3 to 7 am on July 4, during which he conducted 15 rounds. Hughes testified that because Bohanan had vomited four times since his prior cleaning, (Doc. 61, PageID 4647), he asked Moody for permission to clean the cell again. (*Id*., PageID 4582-83). Moody granted that request, and Bohanan went to shower while Hughes cleaned the cell. (*Id*., PageID 4581-82). Hughes testified that when he looked toward the shower stall, he saw Bohanan squatting down holding his ankles. (*Id*., PageID 4584).

Shift logs do not reflect any notable activity during the overnight shift. The undersigned assumes that both Hughes and Bohanan slept given the hour. Hughes testified that he was sleeping at the time breakfast was offered, as was Bohanan, so neither collected a breakfast tray. (*Id*., PageID 4588-89, 4593-94). At lunch time, Hughes asked if he could take Bohanan's tray to him and Moody granted his request. (*Id*., PageID 4589-4590).

Moody was aware that Bohanan had vomited based on Hughes's request to clean the cell, and Plaintiff argues he should have observed Bohanan's "weakness" in the shower. But that is not evidence that Moody inferred that Bohanan was experiencing more than routine withdrawal symptoms that already were being monitored by medical staff, nor does it show Moody's conscious disregard of a serious risk to Bohanan's health. After all, Hughes also testified that Bohanan walked to and from the shower on his own as well

as to conversations that Hughes had with Bohanan. (*Id.*, PageID 4576-4580, 4584, 4590, 4647-4648, 4650). In addition to Bohanan's continued ability to walk and to converse, neither Hughes, Bohanan, nor anyone else asked Moody to obtain medical assistance for Bohanan. Thus, like other correctional officers with limited information about the severity of Bohanan's symptoms during their respective shifts, C/O Moody is entitled to qualified immunity.

### f. Correctional Officer Christopher Benoit

Christopher Benoit worked the night shift on July 4 but conducted only one round at 9:32 pm, after which he entered the familiar entry that "all seems safe and secure." (Doc. 40-3, PageID 1806). Plaintiff argues that during his single round, Benoit should have observed Bohanan lying in his bunk and with visible vomit on Bohanan's sheets. (Doc. 70, PageID 5128). But it is undisputed that Benoit had no interaction with Bohanan other than a brief single visual check through a closed cell door of an inmate who appeared to be asleep. Plaintiff offers no evidence to suggest that during the second or two that Benoit glanced into Bohanan's cell, Benoit actually observed vomit, much less that he inferred that Bohanan required urgent medical attention and deliberately disregarded that need. Benoit is thus entitled to qualified immunity.

### g. Correctional Officer James Guard

C/O James Guard conducted rounds during the same overnight shift between 7 pm on July 4 and 7 am on July 5. (40-3, PageID 1805-07; Doc. 51-2, PageID 3583-84). Ratliff testified that Bohanan did not leave his bunk. However, Plaintiff does not point to any evidence that Guard had any information about Bohanan's illness other than observing what appeared to be a sleeping Bohanan during an overnight shift and modest

circumstantial evidence (Ratliff's testimony) that Guard may have noticed signs of illness - that Bohanan did not leave his bunk  and evidence of vomit or feces on Bohanan's sheets if he looked closely.[20] But even if Guard intuited that Bohanan was ill and not merely sleeping throughout an overnight shift, there was no reason for Guard to suspect serious illness. No one spoke to Guard about Bohanan or sought his assistance on Bohanan's behalf during his shift. Given the complete absence of evidence that Guard actually drew an inference that Bohanan required urgent medical care, he too is entitled to qualified immunity.

### h. Correctional Officer Zachary Mitchell

C/O Mitchell worked the day shift after Guard left, beginning around 7 am on July 5.[21] During his shift, he conducted roughly 15 rounds and 2 inmate counts in which he reported that all were "safe and secure." (Doc. 51-2, PageID 3583-87). But Ratliff alerted Mitchell to Bohanan's deteriorating condition around 10:30 am, asking "is there anything we can do for this guy?" (Doc. 62, PageID 4750). Ratliff reported: "[H]e's not ate, he's not drank any water, he's not used the bathroom, he's not moved from the one position." (*Id.*, PageID 4749; *see also id.*, PageID 4750-51, stating that he told Mitchell that Bohanan had "not moved from the fetal position," and "keeps puking and peeing and crapping all over himself."). Ratliff told Mitchell it "smells pretty bad" and that "the guy clearly needed help.") (*Id.*, PageID 4751). In response, Mitchell incorrectly told Ratliff that "unfortunately, there's not anything that we can do, because the only thing you can die – or withdrawal

---

[20]Although Ratliff testified that there was vomit on the Bohanan's sheets, he also testified that there was no visible vomit on the walls, toilet, or floor. (Doc. 62, PageID 4782-83).

[21]The record reflects that Mitchell also had brief contact with Bohanan on July 1 when he was first booked into the Jail. But Bohanan did not exhibit or report withdrawal symptoms at the time of booking.

you can die from is alcohol and, unfortunately, he's not withdrawing from alcohol." (*Id.*, PageID 4750; *see also id.*, PageID 4726, 4788).

About an hour later at 11:33 am, Mitchell stood by the cell while Paramedic Biegel conducted a brief examination and recorded Bohanan's vital signs. Beigel's report states that Bohanan walked to the cell door to be examined, but sat during the exam. Ratliff testified that Bohanan's breathing sounded like a "death rattle" at the time. Mitchell testified that Bohanan appeared lethargic and had "a little bit of black phlegm on the front of his uniform shirt." (Doc. 51, PageID 3532-33). Still Biegel verbally pronounced Bohanan's vital signs to be "normal" and/or "fine." (Doc. 62, PageID 4754, 4751, 4726).

Around 3 to 4:47 pm, Bohanan's cell door was open for recreation, but Bohanan did not leave his cell. (Doc 51-2, PageID 3586-87). Mitchell rounded at 3:29 pm and again at 4:07 pm, and would have seen Bohanan lying in his bed. (Doc. 62, PageID 4762, 4781-82, 4795, 4799). Ratliff also testified that Bohanan did not arise to collect a "sack lunch" style dinner on July 5, but continued to vomit and defecate on himself. (Dep. 62, PageID 4741-42, 4747-48). Plaintiff argues that the "sight and smell of feces and vomit… were obvious" by the time of Mitchell's shift on July 5. (Doc. 70, PageID 5128). Yet Ratliff testified that there was no visible filth in the cell and "nothing to clean except him [Bohanan]." (Doc. 62, PageID 4782-83).

Under the Eighth Amendment standard, Mitchell remains entitled to qualified immunity. Ratliff's testimony reflects that Mitchell erroneously believed that Bohannan was not at risk of death because "unfortunately" only alcohol withdrawal could result in death. And an hour after Ratliff's query about whether anything could be done for Bohanan, Mitchell watched as a paramedic evaluated Bohanan and pronounced his vitals

to be "fine." Mitchell testified that he did not observe Bohanan "being in distress or needing immediate assistance, especially since he had been cleared by medics." (Doc. 51, PageID 3533).

> When officers are not "subjectively aware of a substantial risk of serious harm," it "cannot be shown that they acted with deliberate indifference." *Ruiz-Bueno v. Scott*, 639 Fed. Appx. 354, 361 (6th Cir. 2016))…
>
> Cases in this and other circuits demonstrate that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he "reasonably deferred to the medical professionals' opinions."

*McGaw*, 715 Fed. Appx. at 497-98 (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official … will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*, 715 Fed. Appx. at 498 (internal quotation marks and citation omitted). Mitchell is entitled to qualified immunity because Plaintiff cannot show that he inferred a serious risk to Bohanan and deliberately disregarded that risk.

### i. Correctional Officer Brandon Wood

C/O Brandon Wood worked an overnight shift at 7 pm on July 5.[22] Plaintiff argues that Wood exhibited deliberate indifference because he saw Bohannan "in his worst condition" mere hours before his death. (Doc. 70, PageID 5129). But Wood testified that when he was making rounds, he saw Bohanan standing and walking around in his cell. (Doc. 39, PageID 1577-1578). Around 10 pm, Wood passed out razors and saw Bohanan seated on the floor in "a normal position" and observed him look up at Wood as he passed by. (*Id.*, PageID 1564). Wood did not see or smell any evidence of sweating, vomit or

---

[22]Wood also worked an overnight shift on July 1 at a time when Bohanan had not yet shown symptoms.

feces, nor did he otherwise perceive Bohanan to be in any distress. (*Id*., PageID 1564, 1583). But when Wood passed by the cell again twenty minutes later, he saw Bohanan lying on his side, in an "uncomfortable" position. Wood testified that when he observed Bohanan laying on his side, he "looked deeper" and "noticed a greenish substance that, based on my previous experience as a combat medic, I knew to be bile on the front of his shirt." (*Id*.) Upon that observation, Wood "immediately put my clipboard and everything down, opened his cell door and went in to try and get his attention…." (*Id*., PageID 1565). Bohanan was unresponsive and had no pulse. He was pronounced dead at 11:50 pm that evening. (Doc. 43-4).

Another inmate in the E-pod on July 5, James Trammel, wrote a grievance after Bohanan's death in which he complained that Ratliff had informed a correctional officer (presumably Wood) that Bohanan was "barely moving" and "only getting up to vomit black." In response, the officer asked "another officer in charge what to do," The unidentified second officer-in-charge laughed and said, "we will see what happens." (Doc. 66-1, PageID 4932).[23] Trammel's grievance does not demonstrate deliberate indifference by Wood. To the contrary, the officer inquired of his supervisor about "what to do," and – for the reasons previously stated – lacked sufficient knowledge of the severity of Bohanan's condition to understand the dire nature of his symptoms. Therefore, Wood too is entitled to qualified immunity.

---

[23] This response, if said, and with the laughter, is deplorable and not condoned by this Court.

### 2. Plaintiff Shows Sufficient Evidence of Deliberate Indifference by Paramedics Pearson and Biegel to Proceed to Trial

Analysis of the subjective component for examining and treating medical providers differs from analysis of Defendants who had no such training. On the one hand, "[t]he subjective requirement is designed "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446-47 (6th Cir. 2014) (quoting *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir.2001)).

> But "a doctor's provision of 'grossly inadequate medical care' to an involuntary detainee may amount to deliberate indifference." *Miller v. Calhoun Cnty*., 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Terrance* [*v. Northville Reg'l Psychiatric Hosp*, 286 F.3d 834, 844 (6th Cir. 2002)]… "Grossly inadequate medical care is medical care that is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id*. (quoting *Terrance*, 286 F.3d at 844). And when the medical need is obvious, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Terrance*, 286 F.3d at 843 (citation omitted).

*Helphenstine*, 60 F.4th at 322. Based on the record presented, the undersigned concludes that Plaintiff's deliberate indifference claims against the two paramedics who attended to Bohanan should proceed to trial.

#### a. Jamie Pearson

Officer Green reported Bohanan's complaints of vomiting and withdrawal symptoms to Pearson around noon on July 2. A jury could find she was aware he had "laid down" on the floor during tray pass in an effort to obtain medical attention. Yet she declined to examine him, telling Green she was already aware of his complaints. The next day, when she did examine him, Bohanan told her he was withdrawing from both opioids and alcohol. But she charted only that she did not personally observe "visible signs" of

his withdrawal, omitting the symptoms reported to her by Green and by Bohanan himself. She documented his temperature, pulse, oxygen saturation level and blood pressure of 90/50. And she charted the following note:

> INMATE NOTES HE IS WITHDRAWING FROM OPIATES AND ETOH, HE CURRENTLY IS EXHIBITING NO VISABLE S/S OF WITHDRAWS. HE NOTES HE LAST USED PAIN MEDS ABOUT THREE DAYS AGO OFF THE STREET, NOTHING PRESCRIBED. HE NOTES TO DRINKING A 5TH OF LIQUOR SEVERAL TIMES A WEEK . . IMNATE ALSO CLAIMS HE WAS ASSAULTED THIS AM BUT (sic) HIS CELLMATE AND PUNCHED X 1 IN THE LEFT SIDE OF THE FACE. INMATE HAS NO BRUISING, MARKS, SWELLING OR LACERATIONS TO THE LEFT SIDE OF HIS FACE. NO LOC AND DENIES BEING STRUCK MORE THAN ONCE OR ANYWHERE ELSE . WILL PLACE ON VITAL QD X7D TO MONITOR FOR ANY S/S OF WITHDRAWS.

(Doc. 38-5, PageID 1426).

Jail protocols afforded Pearson discretion on how to assess symptoms, whether to order any monitoring or closer observation, whether to administer medications to alleviate symptoms, and whether to consult with a physician or other advanced care practitioner. Pearson chose to do nothing other than placing Bohanan on a 7-day once-a-day vitals check in conformity with "standard practice" for withdrawing inmates at that time. (Doc. 38, PageID 1222).

Defendants argue that Pearson's adherence to the Jail's unwritten practice of ordering a daily "vitals check" is evidence that she did not exhibit deliberate indifference. As further evidence of her subjective state of mind, Defendants cite to Pearson's testimony that she viewed Bohanan's low blood pressure as "not horrible," (*Id.*, PageID 1348),[24] and accurately charted that she did not *personally* observe signs of symptoms

---

[24]In contrast to Pearson's suggestion that Bohanan's blood pressure was normal, Plaintiff's expert opined that blood pressure of 90/50 is abnormally low and may have signified a serious medical problem. (Doc. 64-3, PageID 4856).

of withdrawal at the time of her exam. (*Id.*, PageID 1351, 1356, 1369; Doc. 52, PageID 3814; Doc. 64-3, PageID 4884). In addition, when she returned the next day, Pearson charted Bohanan's improved blood pressure.

But Plaintiff's expert, Dr. Keller, offers opinions on which a reasonable jury could base a finding that Pearson's conduct fell so far below the standard of care for both opioid and alcohol withdrawal in 2021 that it amounted to deliberate indifference. For instance, Dr. Keller opined that the standard of care would have required Pearson to physically examine him more closely for signs of withdrawal, including but not limited to "gooseflesh," dilated pupils, weakness, vomiting, nausea, diarrhea, diaphoresis (excessive sweating), and anxiety. (Doc. 64-3, PageID 4848, 4857). He opines that the severity of opioid withdrawal should be measured through a widely recognized opioid withdrawal metric such as the Clinical Opioid Withdrawal Score ("COWS") or a similar system and "should initially be done 3 to 4 times a day." (*Id.*) Similar scoring systems are used to assess the severity of alcohol withdrawal, including the Clinical Institutes Withdrawal Assessment of Alcohol Scale, revised ("CIWA.") (*Id.*, PageID 4850). He states that standard medications for opioid withdrawal symptoms in 2021 included the use of methadone, buprenorphine or naltrexone, as well as the "Gold Standard" medical use of Suboxone. (*Id.*, PageID 4848-4849).

Common symptoms of opioid withdrawal can cause dehydration that can lead to "dysregulated blood pressure, body temperature, and other negative health outcomes, including "a significant risk of organ damage, organ failure, and death." (*Id.*, PageID 4849). Under the Jail protocols, Pearson easily could have offered medications to treat diarrhea and nausea and could have prescribed a liquid diet without seeking physician

approval. (Doc. 38, PageID 1293, 1297-98; *see also* Doc. 41, PageID 2005). Medications to manage Bohanan's common symptoms of nausea and diarrhea were readily available. (Doc. 41, PageID 2005–2006).

In addition, Bohanan had alerted Pearson to the fact that he had previously been prescribed medications commonly used to control opioid withdrawal symptoms, including Clonidine and Promethazine. Yet Pearson still did not bother to ask on-call medical staff to prescribe them, nor did she ask Bohanan for the name of his pharmacy. (*See* Doc. 64-3, PageID 4854-4856, opining that Pearson should have initiated medications). Both of the medications were "available within the opiate withdrawal protocol." (Doc. 38, PageID 1350). Dr. Keller concludes that Pearson's failure to adequately assess and monitor Bohanan and failure to provide any medication treatment for Bohanan's symptoms, or to consult an advanced medical provider, needlessly prolonged his suffering and contributed to his death. (*Id.*, PageID 4856).

At the time of her July 3 exam and certainly by July 4, other inmates were reporting increasingly obvious visible and olfactory evidence of Bohanan's symptoms that Pearson improbably denies noticing. Construing the evidence in Plaintiff's favor, she asked Bohanan no relevant questions about the frequency of his vomiting or diarrhea or other symptoms, whether his symptoms were improving or worsening, did not assess or score his withdrawal symptoms using any standard metric, and offered no hydration support. A reasonable jury could find that Pearson's conduct toward Bohanan was not merely negligent, but amounted to no treatment at all in violation of the Eighth Amendment. She denied treatment in the face of what had become obvious symptoms that would have alerted anyone not grossly incompetent to the risk of an adverse outcome. Thus, whether

Pearson's conduct amounted to deliberate indifference "is a question best suited for a jury.'" *Helphenstine.* at 323 (quoting *Darrah v. Krisher*, 865 F.3d 361, 370 (6th Cir. 2017)).

### b. Megan Biegel

Similar to Pearson, Defendants argue that the fact that Biegel checked Bohanan's vital signs on the morning of his death, and personally believed them to be adequate, is sufficient to dispel any notion that she consciously disregarded a substantial risk to Bohanan's health or safety. The undersigned disagrees.

Biegel documented that Bohanan "was seen at cell door due to complaint of weakness and *being unable to stand*," and "*was unable to stay standing during assessment* and was assessed while sitting on cell floor." (Doc. 38-5, PageID 1434) (emphasis added). She charted that he was diaphoretic and she knew that he was experiencing both vomiting and diarrhea as part of his ongoing withdrawal from opiates and alcohol. Unlike Pearson, she recalled asking Bohanan (twice) whether he had been eating and drinking, but testified that he "just stared" and "didn't answer." (Doc. 52, PageID 3805). Yet she did not chart his failure to respond. She observed vomit on his shirt but did not chart that either, downplaying it as a "very small spot," in contrast to testimony from others that Bohanan had black fluid on his shirt and reeked.

Bohanan's cellmate testified that by the time of Biegel's visit, Bohanan's breathing had become a "death rattle." Biegel also did not mention that in her notes. She charted a number of vital signs that she should have recognized as concerning under the circumstances including a heart rate of 130 (high), blood pressure of 100/60 (low), and a respiratory rate of 20 (high). (Doc. 64-3, PageID 4858). But she testified that all vital signs

were within normal limits except for his pulse, which was "slightly tachycardic, but …not too big of a concern." (Doc. 52, PageID 3843-3844).

A reasonable jury could find that Biegel subjectively perceived the serious risk to Bohanan's health and consciously disregarded that risk, and/or was grossly incompetent in failing to consult with the on-call advanced provider. The only thing that Biegel did in response to the overwhelming evidence of Bohanan's serious illness was to ask another paramedic what charting she was supposed to do. (Doc. 52, PageID 3831). When the co-worker advised her to review the opiate withdrawal policy, Biegel did so and decided there was nothing more she "had" to do. (*Id.*; *see also* Doc. 52, PageID 3817, 3836, 3851-52).

After Bohanan's death, Health Services Administrator ("HSA") Ruhl[25] initiated a complaint-on-staff against Biegel in order to investigate her potentially unsatisfactory performance. The complaint was never investigated because Biegel resigned soon after Bohanan's death, citing personal reasons for her resignation that were ostensibly unrelated to the death.

### 3. Supervisory Medical Staff Estep, Vaughn, Purdy, Ruhl and Sheriff Jones Lacked the Requisite Subjective Intent

In addition to Paramedics Pearson and Biegel, Plaintiff has named supervisory medical staff and Sheriff Jones. Plaintiff alleges that the referenced Defendants exhibited deliberate indifference when they failed to train or supervise the corrections officers and paramedics who observed or interacted with Bohanan. Plaintiff specifically alleges that Dr. Abdullah,[26] Physician Assistant Purdy, HSA Brian Ruhl, and Medical Supervisors

---

[25]The complaint identifies Ruhl's title as "Medical Administrator." Because Ruhl and other witnesses refer to his title as "Health Services Administrator," the Court does likewise. (*See* Doc. 41, PageID 1829-30).
[26]Butler County contracted with Medical Director Dr. Abdullah; he was not employed directly by the Jail.

Carla Estep and Timothy Vaughan[27] acted with deliberate indifference by "failing to oversee and ensure the provision of and access to medical care" for all inmates including Bohanan. (Doc. 24, ¶ 85). In a section captioned as "Practices, Policies, and Customs of the Butler County Jail and Inadequate Supervision," Plaintiff alleges that the County and the same supervisory employees individually provided inadequate supervision and training of medical staff as well as inadequate policies. (*See id*., ¶¶ 107, 110, 121.). Plaintiff concludes that all medical supervisors and Sheriff Jones are liable for "supervisor liability" under § 1983 because they were "aware of, or facilitated, condoned, or oversaw the unconstitutional conduct of the other Defendants." (*Id*., ¶ 146).

There is no *respondeat superior* liability for supervisors under § 1983. *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). To prove supervisory liability, a plaintiff must show that each defendant was actively involved in offensive conduct that caused injury in a way that shows deliberate indifference. *Helphenstine*, 60 F.4th at 321. In addition, the plaintiff must show a "'causal connection' between the defendant's 'active unconstitutional behavior' and the plaintiff's injuries." *Crawford*, 15 F.4th at 761-762 (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016)). In *Helphenstine*, the Sixth Circuit affirmed summary judgment to a supervising jailer that was based on a "failure to supervise" claim brought by the administrator of the estate of a pretrial detainee. Absent some personal involvement, a claim that hinged on the jailer's "purported failure to act" with "no evidence that he directed any subordinate to act in a way that violated Helphenstine's rights, [or]…. that he authorized or acquiesced in any unconstitutional conduct" was not sufficient. *Id.*, 60 F.4th at 321.

---

[27]Like most medical staff at the Jail, Ruhl, Estep and Vaughan were trained as paramedics.

Here, Plaintiff fails to show any personal involvement by Supervisors Estep, Vaughn, Purdy, Sheriff Jones, or Ruhl that caused Bohanan's injury and death. Estep was Pearson's direct paramedic supervisor from July 2-4, while Vaughan was Biegel's direct supervisor on July 5. In addition, Physician Assistant Purdy was on call from July 2-4. But neither Estep nor Vaughn reviewed the care provided to Bohanan. And while Purdy typically would have briefly reviewed automatic notifications regarding Bohanan's vital signs, no one sought his medical advice so he did not review chart notes or take any action. (Doc. 56, PageID 112-129). Thus, for Estep, Vaughn, and Purdy, Plaintiff identifies nothing beyond a "*respondeat superior*" type of liability for which recovery is foreclosed under § 1983. *Accord Crawford*, 15 F.4th at 761 (holding that supervisory liability "will not attach for a mere failure to act.") (additional citation omitted).

Plaintiff's allegations against Sheriff Jones are similar to those asserted against the jailer in *Helphenstine*. Plaintiff seeks to hold the sheriff liable simply because he was ultimately responsible for all Jail policies and procedures. But a supervisor is not liable under § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999) (additional citation omitted)). An individual supervisor may be held liable in his individual capacity only if Plaintiff can point to "a specific action of each individual supervisor" that would defeat qualified immunity. *Phillips*, 534 F.3d at 544 (dismissing claims against sheriff, mayor, and director of ambulance services). Here,

Plaintiff has failed to show that Sheriff Jones in any way encouraged, condoned, approved or knowingly acquiesced in the violation of Bohanan's constitutional rights. Sheriff Jones's alleged failure of oversight is more appropriately viewed in the context of Plaintiff's *Monell* claim against Butler County than as an individual capacity claim. *See Poynter v. Whitley Cnty. Detention Ctr.*, 722 F. Supp. 3d 745, 756 (E.D. Ky. 2024) (granting summary judgment to jailer because in the absence of personal involvement, "an attempt to hold an officer liable in his individual capacity for his alleged failure to adequately train employees ... improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.") (cleaned up).

The same is true for Plaintiff's claims against HSA Brian Ruhl. Dr. Abdullah testified that "[i]n general" all training for medical staff including paramedics is overseen by Ruhl. (Doc. 55, PageID 4127). So Plaintiff seeks to hold Ruhl responsible for his training and oversight of all medical staff and medical policies at the Jail. In opposition to summary judgment, Plaintiff maintains that Ruhl "failed to create and implement policies and procedures regarding when to transfer withdrawing inmates to the hospital," and "appropriate practices to ensure continuity of care." (Doc. 70, PageID 5134). But those alleged failures-to-enact policies and procedures claims are more appropriately viewed under *Monell* as claims against the County rather than supervisory claims against Ruhl in his individual capacity.

To support a claim of individual liability against Ruhl, Plaintiff points to Ruhl's Rule 30(b)(6) testimony that training concerning withdrawal covered "the policies and procedures that were in place at the time, when the person was hired," including the withdrawal "Protocols" developed by Dr. Abdullah. (Doc. 41, PageID 1989-1990). Training

consisted of having people read the policies and procedures and sign off that they read them. (*Id.*) A third-party provider provided continuing education trainings on a variety of topics including "intox and detox," but Ruhl was uncertain of what training medical staff had received in 2021, and was not personally aware of any additional training on withdrawal beyond the Protocols. (*Id.*, PageID 1990-91). But the referenced testimony is insufficient to show Ruhl's active personal involvement in the constitutional violations that allegedly caused Bohanan's death. Ruhl may have been negligent in the execution of his duties to provide oversight and training, but a mere "failure to act" is not sufficient to support supervisory liability in the Sixth Circuit. And there is no evidence that Ruhl personally authorized or approved his subordinates' unconstitutional actions.

The undersigned recognizes that Plaintiff identifies one specific act by Ruhl – his alleged elimination of a prior HSA's directive requiring pass-on communications between medical staff to be documented in writing. (*See* Doc. 41, PageID 1931-34). But even if Ruhl's change from written to verbal pass-on shift communications could support a finding of deliberate indifference under the strict Eighth Amendment standard, there is no evidence that permitting oral pass-on communications causally contributed to Bohanan's death in this case. So Ruhl remains entitled to qualified immunity.

### 4. Plaintiff Presents Sufficient Evidence of Deliberate Indifference by Dr. Abdullah to Overcome Qualified Immunity and to Proceed to Trial

In contrast to Plaintiff's allegations against other supervisory personnel, Plaintiff's allegations against Dr. Abdullah refer to his personal involvement as Medical Director for the Jail. In that role, he was required to develop "specific protocols and policies in accordance with local, state and federal laws for the treatment and observation of inmates manifesting symptoms of intoxication or detoxification from alcohol, opiates, hypnotics, or

other drugs." O.A.C. § 5120-1-8-09(W). Under that regulation, Dr. Abdullah testified that he developed the Jail's protocols for the paramedics and other medical staff to use for inmates in withdrawal from alcohol and opioids. (*See* Doc. 55, PageID 4173).

Dr. Abdullah's "Comfort and Care for Opiate Withdrawal" Protocol ("Opiate Protocol") states that it is designed to reduce "the number of medical request forms sent to medical, reduc[e] the need for transporting the inmate/detainee [from a cell to receive medical care] which improves safety and security, and …reduc[e] the pain and suffering of the inmate during the time of withdrawal." (Doc. 38-3, PageID 1418). The Opiate Protocol lists three standard medications with prescribed doses that "may" be administered by any medical staff without consulting a physician,[28] including clonidine for restlessness and anxiety, Imodium for diarrhea, and Phenergan for nausea. (*Id.*) Notably, the Opiate Protocol does not require any treatment or monitoring, and affords complete discretion to paramedics on whether to consult an advanced health care practitioner, as well as discretion to diagnose withdrawal, to monitor (or not) and whether to treat any symptoms. Dr. Abdullah testified to his belief that the Opiate Protocol is appropriate because "life threatening" symptoms from opiate withdrawal are "rare, extremely rare…like almost never." (Doc. 55, PageID 4197). He testified that no medication "needs to be given" for opiate withdrawal, unless the patient is "sick enough to die," but explained that "those kinds of protocols don't exist and aren't necessary," (*Id.*). He compared the

---

[28]Although no consultation with a physician or other advanced provider was required, the Protocol advises medical staff to "call the Medical Director or P.A. for further treatment options" for any "[s]ymptoms that persist." (*Id.*) The Protocol does not define "symptoms that persist." (Doc. 38-3). Biegel testified that if she administered any medication under the Protocol, she would wait two days to see if it was effective before contacting a physician. (Doc. 52, PageID 3784).

fatality rate of opioid withdrawal and dehydration to the fatality rate of "a hangnail."(*Id*., PageID 4201, 4206).

Plaintiff presents evidence that the Opiate Protocol did not adequately provide for "treatment and observation" of inmates in withdrawal, and failed to provide "specific criteria" for "immediately transferring inmates experiencing severe, life-threatening intoxication (overdose) or detoxification symptoms to a hospital or detoxification center" as required by Ohio law. *See* O.A.C. § 5120-1-8-09(W). Plaintiff's expert, Dr. Keller, specifically opines that the Opiate Protocol did not meet the standard of care in 2021, and was "grossly inadequate."[29] (Doc. 64-3, PageID 4869). In stark contrast to Dr. Abdullah, Dr. Keller testified that opioid withdrawal in jail can and frequently does cause death, and that several standard medications effectively reduce the mortality rate. (Doc. 64-3, PageID 4867). A jury could find that Dr. Abdullah's active involvement in developing and approving a policy that fell so far below the standard of care constitutes deliberate indifference, because it is obvious and foreseeable that harm would result. Dr. Abdullah's personal involvement in developing Jail "Protocols" that caused the violation of Bohanan's Eighth Amendment rights constitutes the type of encouragement and express approval by a supervisor that can support individual supervisory liability.

Dr. Abdullah also declared, in a "mortality review" conducted after Bohanan's death, that the care provided to Bohanan was "appropriate." (Doc. 55, PageID 4270-4271). Although his post-mortem review, standing alone, cannot give rise to supervisory

---

[29]Plaintiff cites to two expert opinions. Defendants have not moved to exclude the experts but more broadly object to the experts' "legal conclusions." By way of example, the County objects to Dr. Keller's opinions that the individual defendants and Butler County "were derelict in their duty," "disregarded risk of harm," and "violated its responsibility to provide incarcerated patients appropriate medical care." (Keller Rpt., Doc. 64-3). Without crediting "legal conclusions," the undersigned finds portions of the opinions to be highly relevant.

liability because it played no role in *causing* Bohanan's death, it adds to the body of evidence that Dr. Abdullah expressly approved of his subordinates' compliance with his Protocols as written.

### V.    Plaintiff's *Monell* Claims Against Butler County

To succeed on a claim against the County,[30] Plaintiff must show that one or more County policies or customs resulted in the alleged violation of Bohanan's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Plaintiff here argues that Butler County had both written and unwritten policies that caused Bohanan's death, that the County itself provided inadequate training and supervision in a manner that amounted to deliberate indifference, and that County officials ratified the deliberate indifference of Jail staff. *See Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (describing four methods of proving a *Monell* claim). For the reasons discussed, the undersigned recommends that Plaintiff be permitted to proceed to trial on claims that Butler County enacted and maintained unconstitutional customs or policies, and failed to appropriately supervise or train jail staff.

In seeking summary judgment, the County first argues that Plaintiff cannot recover under *Monell* because there was no underlying constitutional violation. Since the undersigned has determined that a reasonable jury could find a violation of the Eighth Amendment, the undersigned rejects that argument. Next, the County argues that it had no unconstitutional policies or customs. Defendants contend that proof of an

---

[30]Although Plaintiff has named Sheriff Jones in his official capacity, that claim is also against the County. *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (holding that an "official capacity" claim is "equivalent to a suit against the local government entity."). Defendants argued for the first time in their reply memorandum that Butler County is not *sui juris* and not subject to suit. Plaintiff filed a motion to strike that argument or, in the alternative, for leave to file a sur-reply. On June 16, 2025, all parties filed a joint stipulation in which Defendants formally withdrew the new argument, stating they "do not challenge Butler County as a named Defendant." (Doc. 75)

unconstitutional custom or policy cannot be based on "a single instance of misconduct." (Doc. 57, PageID 4514). But controlling case law holds otherwise. *See Howell v. NaphCare, Inc*., 67 F.4th 302, 319 (6th Cir. 2023) (holding that "a plaintiff can rely on a single incident to establish liability in a narrow range of circumstances"); *Helphenstine*, 60 F.4th at 323 (holding that a claim can be supported by "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." (quoting *Shadrick v. Hopkins Cnty*., 805 F.3d 724, 738-39 (6th Cir. 2015)). Plaintiff also points to testimony that the Jail routinely failed to medically treat opioid withdrawal symptoms. (Doc. 62, PageID 4806-09 (testimony that inmates routinely went through withdrawal "cold turkey" or unmedicated); Doc. 52, PageID 3760-61 (testimony that Biegel never administered medications or saw any medications administered for withdrawal); Doc. 55, PageID 4198, 4214 (testimony that "not many" inmates ask for medications that are "available….if they want it")).

### A. Alleged Unconstitutional Customs and Policies

One way that Plaintiff can proceed under *Monell* is to identify one or more specific policies, connect them to the County, and show that the policy or policies caused Bohanan's death. *See Jackson*, 925 F.3d at 829. The customs and policies identified by Plaintiff as causal factors in Bohanan's death include: (1) the Jail's written and unwritten opiate withdrawal protocols and the lack of dehydration treatment; (2) the County's custom or practice of gatekeeping medical services, requiring inmates to withdraw "cold turkey," and the lack of communications between medical and correctional staff at shift changes.

### 1. Written Protocols and the Vital Signs Check for Withdrawal

HSA Ruhl testified that medical staff acted in accordance with the County's policies. (Doc. 41, PageID 2031-2033). Those policies directed staff to refer to specific protocols for inmates depending on whether they were withdrawing from alcohol, opiates, or benzodiazepines. The protocols included a Librium Protocol[31] for alcohol or "benzo" withdrawal and the Opiate Withdrawal Policy ("Opiate Protocol"). (Doc. 38-2, PageID 1417). Pearson charted that Bohanan was suffering from both alcohol and opioid withdrawal. The record suggests that Bohanan's nausea and vomiting symptoms are more commonly associated with opioid withdrawal.

As discussed, the Opiate Protocol lists three medications with prescribed doses that "may" be administered by paramedics "to reduce symptoms" without consulting a physician, including clonidine, Imodium and Phenergan. (Doc. 38-3, PageID 1418). Plaintiff's expert, Dr. Keller, opines that neither the Opiate Protocol nor the once-per-day "vitals check" met the standard of care in 2021. According to Dr. Keller, the standard of care required assessing the severity and progression of withdrawal symptoms using a standardized system like COWS, which should have been completed 3-4 times per day. (Doc. 64-3, PageID 4848, 4868). Dr. Keller opines that Butler County's alcohol withdrawal policy and Librium Protocol were similarly deficient. For example, the policy did not employ a standardized scoring system such as CIWA for the assessment and monitoring. (64-3, PageID 4850). In contrast to such standardized metrics, the Jail's Opiate Protocol

---

[31]The Librium Protocol allows any "qualified health care personnel" in their discretion, to initiate a prescription for Librium with placement of an order for the provider to review the chart. (Doc. 38-4). The Librium Protocol warns that inmates "attempt to acquire this medication (due to its tranquilizing effects) through deception and manipulation" and warns staff to be "vigilant of the drug-seeking inmate." (*Id.*)

did not include *any* method for identifying or assessing patients, or for ongoing monitoring of the severity and progression of symptoms.[32]

Dr. Abdullah testified that no other policies in the jail required observation or monitoring of inmates in withdrawal. (Doc. 55, PageID 4219, 4223-4225; *see also* Doc. 41, PageID 1969-70). Medical staff did not have a practice of asking officers to monitor inmates. (Doc. 38, PageID 1289-90). The only monitoring or assessment in place was an *unwritten* Jail policy to place inmates in opioid withdrawal on a once-per-day "vitals check" – a practice that Dr. Keller described as so inadequate that it created a substantial risk of serious harm to Bohanan and in fact caused harm to him. (Doc. 64-3, PageID 4882). Defendant Purdy also admitted that medical staff should check vital signs of patients in withdrawal more than once per day. (Doc. 56, PageID 4444-45).

According to Dr. Keller, the Opiate Protocol was deficient in other ways, including by failing to provide guidance for when to send patients to the hospital. (Doc. 64-3, PageID 4868-69). In addition, the Protocol included no references to standard treatments such as methadone, buprenorphine, naltrexone, or suboxone to reduce morbidity and mortality, additional medications for the treatment of nausea and diarrhea, or other methods for maintaining hydration and nutrition. (Doc. 64-3, PageID 4848-49, 4869). Beyond the shortfalls in assessment, monitoring, and medication use, Dr. Keller opines that the Opiate Protocol improperly afforded unbridled discretion to staff (paramedics) on whether to consult with a physician, whether to offer medications, or whether to offer any treatment

---

[32]Plaintiff has offered more evidence through the opinions of expert Gary Raney who opined that a county should have policies that inform officers how to recognize and monitor inmates in withdrawal through more frequent rounds and monitoring. (Doc. 64-6, PageID 4919). Butler County instructed corrections staff to conduct 40-minute rounds, but did not inform officers of how to recognize and monitor inmates in withdrawal, or when to notify medical staff. (Doc. 42, PageID 2183-2184).

at all. Because paramedics are not licensed to diagnose or to prescribe, such discretion exceeded their scope of practice. (*See* Doc. 64-3, PageID 4881). In addition, the Protocol of allowing paramedics to make such determinations created a foreseeable risk that patients with serious medical needs would not receive the necessary evaluation and treatment. (Doc. 64-3, PageID 4884).

Moreover, the Librium Protocol states that inmates were to be "medically monitored frequently by the medical staff," (Doc. 38-4, PageID 1420), with paramedics having discretion to "monitor patients more closely [only] if they feel like they need closer monitoring." (Doc 41, PageID 1960; *see also id.*, PageID 1961, 1969, 1984, testifying that corrections staff could also monitor inmates despite written limitation to monitoring by "medical staff"). Finally, Dr. Keller criticizes the failure of the policies to address the potential for dehydration from withdrawal symptoms. While easily treatable, untreated dehydration presents a significant risk of organ damage and death. (Doc. 64-3, PageID 4849).

In conformity with the Protocols, Pearson chose not to prescribe any medications to treat Bohanan's diarrhea or nausea, nor did she order any rehydration treatment, despite learning of Bohanan's symptoms on July 2 and confirming his continuing withdrawal from opiates and alcohol on July 3. She chose not to use Protocol medications because she did not personally see "any indications that he was withdrawing" on July 3. (Doc. 38, PageID 1351, 1356, 1369). Apart from the daily "vitals checks" taken on July 3, 4, and 5, Bohanan was never provided medication or assessed by an advanced practitioner from the time he first reported withdrawal symptoms on July 2 until his death on the evening of July 5. Plaintiff persuasively argues that there is sufficient evidence to

present to a jury that deficiencies in the County's written Opiate and Librium Protocols, the unwritten "vitals check" policy, the unbridled discretion afforded to paramedics, and the lack of a dehydration policy all increased Bohanan's suffering and led to his death.

### 2. The County's Customs of "Gatekeeping," Practice of "Cold Turkey" Withdrawals, and Shift Communication Policies

In addition to the identified written Protocols and "vital signs" policy, Plaintiff asserts that the County fostered a "custom of distrust" of inmate medical complaints. Correctional officers had discretion to determine whether an inmate was "unreliable" and similarly had discretion to decide whether to tell a medic about an inmate's withdrawal symptoms. They were not required to document any symptoms that they observed but chose not to report. (Doc. 42, PageID 2223, 2225-2226, 2228-2229). *See, generally, Helphenstine*, 90 F.4th at 325 (holding that a reasonable jury could conclude that correctional officers were not sufficiently trained on how to identify or address medical emergencies); *Sturgill v. Muterspaw*, 2024 WL 3925663, at \*19 (reasonable jury could conclude that City's inadequate training program amounted to deliberate indifference, because the risk in delegating to untrained jail employees the task of determining when to contact medical staff, and whether a medical emergency existed, was "patently obvious."). Consistent with the same culture of distrust, paramedics who observed an inmate with abnormal vital signs and reports of ongoing vomiting or diarrhea would contact an advanced provider only if the inmate's symptoms "could be substantiated" by the paramedic. (Doc. 41, PageID 1978-79).

Plaintiff also points to Ratliff's testimony that in practice, most inmates suffering from opioid withdrawal were required to withdraw "cold turkey" without any treatment for symptoms or orders for "comfort" medications. (Doc. 62, PageID 4806-08; *see also* Doc.

52, PageID 3760-61; Doc. 55, PageID 4198, 4214). And Plaintiff more broadly complains that Butler County maintained a general policy of inadequate communication between medical and correctional staff, especially at shift changes. (Doc. 42, PageID 2229-32). Plaintiff asserts that the County did not require medical staff to communicate with other medical staff "to ensure continuity of care and observation" or to communicate with correctional staff. (Doc. 64-3, PageID 4868-69). Medical charting software used by medical staff had a tool for communications, while a different policy required correctional staff to communicate with incoming staff. Doc. 41, PageID 1930-31). Medical staff engaged in shift-change communications for important information. (*Id.*, PageID 1928-29, 1933). No policy required communications about Bohanan's ongoing symptoms between medical or correctional staff and none were created.

The undersigned concludes that Plaintiff's evidence regarding the County's alleged "gatekeeping," "cold turkey" and general staff communications policies substantially overlaps with Plaintiff's criticisms of the Jail's Protocols and vitals-check policies, which the undersigned already has determined are sufficient to present to a jury. Any evidentiary rulings on the admissibility of specific evidence should be left to the trial judge.

### B.  The County's Alleged Failure to Train

In addition to alleging multiple unconstitutional customs and policies, Plaintiff seeks to hold the County liable for its failure to train and supervise its employees. "'[F]ailure-to-train liability is concerned with the *substance* of the training….'" *Howell*, 67 F.4th at 320. (emphasis added, quoting *Connick v. Thompson*, 563 U.S. 51, 68 (2011)).

> To succeed on a failure-to-train claim, a plaintiff must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy

was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Regarding the second prong, a plaintiff most commonly demonstrates a municipality's deliberate indifference by pointing to a failure to act "in response to repeated complaints of constitutional violations by its officers." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). But a plaintiff can rely on a single incident to establish liability in a narrow range of circumstances "if the risk of the constitutional violation is so obvious or foreseeable" that it amounts to deliberate indifference for the municipality to fail to prepare its officers for it. *Id.*

*Howell*, 67 F.4th at 319. In the case presented, Plaintiff's experts describe the County's training on substantive withdrawal policies as unreasonable and inappropriate. Plaintiff's expert further opines that the risk to inmates experiencing withdrawal as a result of the inadequate training and supervision under the policies was obvious and should have been known by Butler County and those Defendants administering the policies on the County's behalf, and caused Bohanan's injury and death in this case. (Doc. 64-3, PageID 4874, 4875, 4877, 4881, 4884).

Butler County provided annual training for medical staff on hunger strikes, tuberculosis, suicide, and the Prison Rape Elimination Act ("PREA"). (Doc. 38, PageID 1197). Notably, the Jail did not train staff on substance use disorders or withdrawal beyond ensuring their familiarity with the protocols that were in place. (Doc. 41, PageID 1987-1989; Doc. 38, PageID 1197-99, 1288, 1311, 1317, 1322).[33] The County also provided no training on dehydration beyond what paramedics would have received as part of their paramedic certification. (Doc. 38, PageID 1311). No policy instructed medical staff on what information to gather about symptoms, such as the frequency of vomiting or

---

[33]The County began providing more training on substance abuse disorders and withdrawal after Bohanan's death. (Doc. 38., PageID 1199, 1288).

diarrhea, or the amount and frequency of an inmate's intake of food and water. Nor did the County train paramedics on when to contact an advanced provider. (Doc. 38, PageID 1288). *Compare*, *generally*, *Helphenstine*, 60 F.4th at 324 (contrasting the prevalence of drug and alcohol withdrawal with the absence of guidelines on how staff should care for an inmate experiencing withdrawal).

Plaintiff's evidence strongly suggests that the risk of serious injury from inadequate diagnosis, monitoring, and treatment of drug and alcohol withdrawal symptoms was obvious and foreseeable. The record suggests that paramedics provided nearly all routine assessment and care. Dr. Abdullah testified that "80 percent of people in here have fentanyl and heroin use" and that "half the people…if not more, are addicted to opiates," meaning that opioid withdrawal is very common. (Doc. 55, PageID 4193, 4197). A jury could find that the County chose not to provide any training to paramedics about substance use disorders or withdrawal despite foreseeable risks from opiate withdrawal including dehydration. A jury could further find that the County knowingly permitted paramedics to operate outside the scope of their practice by instituting withdrawal Protocols that not only required no consultation with an advanced care provider capable of diagnosing such conditions, but were written to minimize consultations. *See Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d at 739-40 (holding that a reasonable jury could find that the potential risk of the commission of constitutional torts by LPN nurses who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting was so obvious that lack of training and supervision constituted deliberate indifference to the risk); *see also Estate of Marti v. Rice*, No. 1:19-cv-980, 2023 WL 145592, at *15-19 (S.D. Ohio Jan. 10, 2023), report and

recommendation adopted at 2023 WL 6348381 (S.D. Ohio Sept. 29, 2023); *Abdiasiis v. Lewis*, Case No. 2:20-cv-3315, 2022 WL 2802412, at *9-11 (S.D. Ohio Jul. 18, 2022).

### C.  The Ratification Theory of County Liability

Above, the undersigned has explained why two of Plaintiff's *Monell* theories of liability (the unconstitutional customs and policies argument, and the failure-to-train and supervise argument) survive Defendants' motion for summary judgment. Less persuasive is Plaintiff's assertion that the County is liable for "ratifying" officials' deliberate indifference to Bohanan through its failure to discipline its corrections and medical staff following his death. The County's failure to discipline jail staff *after* Bohanan's death cannot possibly be deemed to have caused his death.

Similarly, although Plaintiff alleges a second drug withdrawal death occurred at the Jail just two months *after* Bohanan's death, she does not cite to any evidence of such deaths at the Jail *before* Bohanan's death. For that reason, the undersigned rejects as overly speculative Plaintiff's alternative argument that the fact that the County has never disciplined anyone for medical issues experienced by inmates proves that the County "has ratified its employees' prior unconstitutional conduct as consistent with its policies." (Doc. 70, PageID 5146).

### VI.    Duplicative Constitutional Claims

Plaintiff's "First Claim For Relief" under § 1983 generally alleges that all Defendants "deprived Cody Bohanan of clearly established rights, privileges, and immunities secured by the *Fourth*, *Fifth*, *Eighth and Fourteenth* Amendments to the United States' Constitution, including but not limited to the right to be protected, provided adequate medical and mental health care for serious medical needs, and the right to be

free from deprivations of liberty and necessary care that are unreasonable and shock the conscious [sic]." (Doc. 24, ¶124, emphasis added). Plaintiff has presented sufficient evidence to defeat summary judgment on the Eighth Amendment claims against Paramedics Pearson and Biegel, and Butler County. But Plaintiff offers no explanation of how Defendants violated Bohanan's rights under the Fourth or Fifth Amendments. And as for the Fourteenth Amendment claim, courts have "resisted relying on the Due Process Clause when doing so would have duplicated protection that a more specific constitutional provision already bestowed." *Albright v. Oliver*, 114 S.Ct. 807, 820, 510 U.S. 266, 288 (1994). Therefore, the undersigned recommends dismissal of Plaintiff's Fourth, Fifth, and Fourteenth Amendment claims as duplicative.

### VII.    State Law Claims

Plaintiff's amended complaint purports to set out five separate state-law claims. In what is designated as Plaintiff's third claim, she alleges that the seven medical staff (Dr. Abdullah, P.A. Purdy, HSA Ruhl, Supervisors Estep and Vaughan, and Paramedics Pearson and Beigel), "breached their duty to provide medical care" and committed medical malpractice. (Doc. 24, ¶¶ 150-156). In her fourth claim, she alleges "negligence" by the same seven medical staff as well as by Butler County itself, both based on Defendants' individual actions and under the doctrine of *respondeat superior*. (*Id*., ¶¶157-165). Plaintiff's fifth claim[34] alleges "willful, wanton, and reckless conduct" by all nineteen Defendants, including Sheriff Jones, the seven medical staff, the ten correctional staff, and Butler County. (*Id*., ¶¶ 166-170). Finally, Plaintiff sets forth two statutory claims

---

[34]To the extent that Plaintiff's fifth claim purports to be a *separate* claim for reckless conduct, it should be dismissed. The allegations contained within that "claim" are properly construed as supporting Plaintiff's other state-law claims. *See Bickerstaff v. Lucarelli*, 830 F.3d 388, 399 (6th Cir. 2016).

against all Defendants for wrongful death under Ohio R.C. § 2125.02, (*see id.*, ¶¶ 171-175), and for survivorship under Ohio R.C. § 2305.21. (*Id.*, ¶¶ 176-179).

Defendants assert statutory immunity for all state-law claims. Ohio R.C. §2744.03(A) provides for political subdivision and employee immunity from any "civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function" under the following circumstances:

> (5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources *unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner*.

> (6) In addition…. the employee is immune from liability unless one of the following applies:
> …
> (b) The employee's acts or omissions *were with malicious purpose, in bad faith, or in a wanton or reckless manner*….

Ohio R.C. § 2744.03(A)(5) and (6).

In *Anderson v. Massillon*, 983 N.E.2d 266, 273, 134 Ohio St.3d 380, 388, 2012 - Ohio- 5711, ¶ 34 (Ohio, 2012), the Ohio Supreme Court defined "reckless" conduct as that "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." Plaintiff concedes that Ohio's definition of recklessness generally tracks with the subjective prong of the Eighth Amendment deliberate indifference standard. (Doc. 70, PageID 5151). Because Plaintiff has presented sufficient evidence to meet the Eighth Amendment standard as to Defendants Pearson, Biegel,

Abdullah, and Butler County, the immunity afforded by R.C. § 2744.03(A) does not apply to those Defendants. At the same time, Butler County remains entitled to immunity under Ohio R.C. § 2744.02(A)(1). As a result, the undersigned recommends that summary judgment on Plaintiff's state-law claims be granted in favor of all Defendants except for Defendants Pearson, Beigel, and Abdullah. Plaintiff's state-law claims against those three individual Defendants alone should proceed to trial.

Plaintiff briefly argues for a narrower reading of the immunity granted under Ohio law. She seeks a ruling that Defendants' statutory immunity can be defeated so long as Plaintiff can prove a lower standard of "reckless" conduct that "tracks directly with the lower bar of the Fourteenth Amendment deliberate indifference framework applicable to pretrial detainees." (Doc. 70, PageID 5151) But Plaintiff cites no controlling or persuasive case law that suggests that Ohio intended to use the lower Fourteenth Amendment subjective standard for its statutory recklessness determination. The undersigned therefore rejects the invitation to unduly narrow the broad scope of Ohio's stated statutory immunity for state-law claims.

## VIII. Conclusion and Recommendations

For the reasons discussed, **IT IS RECOMMENDED THAT**: Defendants' Motion for Summary Judgment (Doc. 57) be GRANTED IN PART and DENIED IN PART as follows:

1. Defendants' motion should be denied and Plaintiff's Eighth Amendment and state-law claims should be proceed against Defendants Pearson, Beigel, and Abdullah in their individual capacities;

2. Defendants' motion also should be denied as to Plaintiff's *Monell* claim against Butler County and against Sheriff Jones in his official capacity;

3. For all other claims and Defendants, Defendants' motion should be granted.

.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

VICTORIA MATTHEWS, Administrator
of the Estate of Cody Bohanan,

       Plaintiff,

       v.

BUTLER COUNTY, et al.,

       Defendants.

Case No. 1:22-cv-380

Barrett, J.
Bowman, M.J.

**NOTICE**

Under Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).